# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong World Industries, Inc.,    :
                              Petitioner    :
                                                :
                    v.    :    No. 1089 C.D. 2017
                                                  :    Argued:  September 14, 2018
Workers' Compensation Appeal    :
Board (Cooper, deceased),    :
                            Respondent    :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                     HONORABLE CHRISTINE FIZZANO CANNON, Judge
                     HONORABLE JAMES GARDNER COLINS, Senior Judge


## OPINION NOT REPORTED


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: November 16, 2018**


Armstrong World Industries, Inc. (Employer) petitions for review of the July 24, 2017 Order[1] of the Workers' Compensation Appeal Board (Board) reaffirming its prior November 26, 2014 Order that upheld the Workers' Compensation Judge's (WCJ) June 28, 2012 decision granting the Claim Petition filed by Gene M. Cooper (Claimant).[2]  The WCJ found that Claimant had timely filed his Claim Petition and granted the Claim Petition based on her finding that Claimant suffered

---

[1] This matter was argued seriately with *Cooper (Deceased) v. Workers' Compensation Appeal Board (Armstrong World Industries, Inc.)* (Pa. Cmwlth., No. 1163 C.D. 2017, filed November 16, 2018), which involves a separate appeal from this July 24, 2017 Order filed by Claimant.

[2] Claimant passed away on February 5, 2014.

from work-related toxic encephalopathy with Parkinsonian symptoms caused by his exposure to a variety of chemicals and solvents at work. On appeal, Employer argues the Board erred: (1) by applying the discovery rule to conclude the Claim Petition was timely under Section 315 of the Workers' Compensation Act[3] (WC Act); and (2) in holding that Claimant met his burden of proving that his condition was caused by work-related exposure to trichloroethylene (TCE).[4] After review, we discern no error in the Board's decision and, therefore, we affirm.[5]

## I. Background

Now in its 11th year, this litigation has a procedurally complex and highly contentious history. On December 17, 2007, Claimant filed the Claim Petition alleging that he sustained "encephalopathy with dementia" as of June 15, 2004, due to "toxic exposure" while in the course and scope of his employment. The Claim Petition was amended, pursuant to Section 108(c) of the WC Act, 77 P.S. §

---

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 602.

[4] Employer asserts four issues in its brief, which have been consolidated into these two issues.

[5] Also before this Court is Claimant's Application to Strike the Pleadings filed by Barley Snyder, LLP, Employer's counsel, (Application to Strike), in which Claimant alleges that, on May 5, 2016, the WCJ issued an order, via email, that disqualified counsel from further representing Employer and that this order was never vacated. Because this order remains in effect, Claimant asserts, all of the pleadings and filings made by Employer's counsel should be stricken. Employer filed a response, asserting the Application to Strike is without merit and should be dismissed. We agree. In a December 7, 2016 decision (2016 Decision), the WCJ expressly denied all of Claimant's motions and/or requests to disqualify Employer's counsel from further participation in the ongoing litigation in this matter. Thus, to the extent that the WCJ's May 5, 2016 email could be construed as Claimant asserts, the WCJ essentially vacated that "order" when she denied all of Claimant's motions and/or requests to disqualify counsel in the 2016 Decision. Accordingly, Claimant's Application to Strike is denied.

27.1(c),[6] to reflect that "Claimant was diagnosed with a work[-]related brain disease, Parkinson's disease."[7] (WCJ Decision, June 28, 2012, Finding of Fact (FOF) ¶¶ 1-2.) Claimant filed, on February 13, 2008, an occupational disease claim alleging he had "solvent induced encephalopathy with dementia" due to "[c]hronic exposure to hydrocarbon distillates and halogenated hydrocarbons." (*Id.* ¶ 4.) Employer filed answers, denying the allegations and raising the defense that the petitions were barred by the statute of limitations. (*Id.* ¶¶ 3, 5.)

Over three years,[8] the WCJ held numerous hearings, at which all witnesses, including experts, testified in person. Following those hearings, the WCJ rendered a 96-page decision, which summarizes the testimony of the witnesses and evidence presented in 97 findings of fact. She issued credibility determinations and provided explanations for those determinations. The testimony and evidence accepted as credible by the WCJ establish the following relevant facts. The facts relevant to Employer's defense, which were not found to be credible and/or convincing, are also set forth as noted.

Claimant began working for Employer in April 1974. Over the next 30 years, Claimant worked in various locations throughout Employer's Lancaster plant and Hempfield warehouse. He spent some time in "Job Placement," which meant he was sent to whatever department in the Lancaster plant needed

---

[6] Section 108(c) was added by Section 1 of the Act of October 17, 1972, *as amended*, 77 P.S. § 27.1(c).

[7] Claimant had begun to exhibit Parkinsonian symptoms, including rigidity and tremors.

[8] During this time period, Claimant filed numerous Penalty Petitions against Employer, including ones on December 28, 2010, August 2, 2011, and November 20, 2011, which were addressed and denied by the WCJ in her June 28, 2012 decision. This denial was affirmed by the Board in its November 26, 2014 decision. (Board Op., Nov. 26, 2014, (2014 Board Op.) at 25-26.) Claimant did not appeal the denial of these Penalty Petitions.

assistance. (*Id.* ¶¶ 14i, 50c, 98.) Employer did not know where Claimant worked when he was on "Job Placement." (*Id.* ¶ 50c.) He worked at Employer's warehouse from 1979 until 1983, when he was transferred to Employer's centralized Inspections Department (Inspections) at its Lancaster plant. (*Id.* ¶ 98.) Claimant was assigned to work in the "Big Room" for most of his career, which meant he inspected flooring product brought to that room from other areas of the plant. (*Id.* ¶¶ 14*l*, m.) However, as part of his duties, Claimant would also travel to production lines outside the "Big Room," including "12 Line" and "Ten Table" to inspect flooring there. (*Id.* ¶ 98.) Employer decentralized its inspections operation in 2000, assigning inspectors to individual production departments to inspect the flooring on the production line. (*Id.* ¶ 14m.) Claimant was transferred to the Corlon Department (Corlon), which made commercial flooring. (*Id.* ¶¶ 14m, 98.) Claimant worked in Building 200 on "Ten Table." (*Id.* ¶ 98.)

While working in Inspections and Corlon, Claimant was required, as needed, to travel to various production lines to inspect product and to use certain solvents to clean equipment, such as parts and rollers. (*Id.* ¶¶ 11, 14n.) A solvent called Chlorothene was used to clean on a daily or almost daily basis, although using that solvent was not a major part of an inspector's duties. (*Id.* ¶ 11.) In 2000, Claimant's wife (Wife) began to notice a difference in Claimant's behavior, such as his regularly becoming irritable over nothing. (*Id.* ¶ 25j.)

While working in Corlon in September 2003, Claimant was called to assist in cleaning up 500 to 750 gallons of "Top Foam" that had spilled in Employer's Rotogravure Department (Rotogravure). (*Id.* ¶¶ 21e-g, 30-31, 33, 99, 101.) Top Foam was composed of, among other ingredients, "paste" (which contains some arsenic), Intercide ABF-2 DINP BA, plastisols, and Solvesso. (*Id.* ¶¶ 21e, 30i-k,

33z.) Solvesso was also used to clean the floors after the spill. (*Id.*) Wife testified that, in the last week of September 2003, Claimant came home from work screaming, crying, swearing, and coughing as Wife had never heard before. (*Id.* ¶ 25k.) They sought treatment for Claimant's cough, but it did not resolve after two courses of antibiotics. She further explained that Claimant never had any difficulty learning, having obtained a business and finance degree from Millersville College (now University) in 1989 and completed coursework toward an insurance certificate to sell securities at Villanova University. Yet, from September 2003 onward, Claimant's mental and behavioral condition began to deteriorate.

In April 2004, Claimant moved to an entry level position in Rotogravure. (*Id.* ¶ 98.) Solvesso was commonly used as a cleaner in Rotogravure. (*Id.* ¶¶ 18d, 18k, 30*l*, 30u, 33f.) After his transfer, Claimant had problems during his Rotogravure training with forgetfulness and an inability to learn the job. (*Id.* ¶¶ 18j, 30t, 30x, 38k.) Claimant left work sick on April 23, 2004, and never returned. (*Id.* ¶ 104.)

Following his departure, Claimant's mental and physical conditions continued to deteriorate until Wife had to obtain legal guardianship of Claimant due to his incapacity. In 2006, Claimant was placed in a secure residential facility. It was while Claimant was in this facility in November 2007 that Wife saw a document, from Employer's long-term disability carrier, on which Claimant's then-treating physician indicated that Claimant's condition was work-related. (Hr'g Tr., Feb. 7, 2008, at 9-10.) This, according to Wife, was the first time she learned that Claimant's condition could be work-related. (*Id.* at 11; 2012 FOF ¶ 102.) Based on this information, she filed the December 17, 2007 Claim Petition.

During discovery, Claimant requested from Employer records related to the chemicals to which Claimant was exposed during his work history. Employer could not produce these records because, it stated, those records, along with other records requested, had been inadvertently destroyed during the demolition of numerous buildings at the Lancaster plant. Although Claimant questioned the validity of Employer's assertion, he presented other evidence to describe his exposure to chemicals at work. Claimant presented multiple Material Safety Data Sheets (MSDS) for chemicals and solvents used at the plant, which he had received from Employer during discovery. These included:

- Chlorothene; 1, 1, 1 Trichloroethane (TCA or Trichloroethane),[9] the main component of Chlorothene;

- Solvesso (also known as Aromatic 150);

- #4 Solvent;

- TCE, the main component of #4 Solvent;

- Methylene Chloride, another component of #4 Solvent; and

- ABF-2 DINP BA.

(2012 FOF ¶¶ 13, 20, 52, 58-60.) Of these materials, TCA, TCE, and Methylene Chloride are halogenated hydrocarbons,[10] and Solvesso is a hydrocarbon distillate.

---

[9] Finding of fact 60 refers to Exhibit C-26 as a MSDS for "1, 1, 1 Trichloroethylene." (2012 FOF ¶ 60.) This appears to be a typographical error because the MSDS marked Exhibit C-26 is for "1, 1, 1 Trichloroethane." (Ex. C-26.)

[10] Finding of fact 64i also refers to "1, 1, 1 Trichloroethylene." Chemist agreed at the September 29, 2009 hearing that "1, 1, 1 Trichloroethylene" is a halogenated hydrocarbon, but it is unclear whether the substance "1, 1, 1 Trichloroethylene" exists. (Hr'g Tr., Sept. 29, 2009, at 34.)

(*Id.* ¶¶ 64i, 77o.) Each MSDS includes the material's chemical makeup and information pertaining to the safety and health concerns for the particular material. Almost all of the MSDS presented reflect that exposure to these materials could affect the central nervous system. (*Id.* ¶¶ 58-61.) The WCJ found the MSDS accurately described the various chemical substances used at Employer's Lancaster plant. (*Id.* ¶ 96.) Claimant also offered Toxic Release Inventories (TRI), which Employer sent to the Environmental Protection Agency and reflected that Employer used TCE at its Lancaster plant and had released TCE "from its stacks" into the air in 1993. (*Id.* ¶ 49.)

Employer's Global Environmental, Health and Safety (EHS) Manager Brent Davis, who is also an industrial hygienist, testified that #4 Solvent, which contains TCE, was used in Employer's Tile Department, a place where Employer asserted Claimant never worked. (*Id.* ¶¶ 77h, 78g.) However, he also acknowledged that TCE "become[s] vapor[] at ambient temperatures and travel[s] everywhere." (*Id.* ¶ 78g.) Mr. Davis also testified that TCE was "present in spray cans, [and] small containers that maintenance would [use] throughout the plant" and that, for a period of time, "Dow Chemical us[ed] the trade name of 'Chlorothene' for trichloroethylene [TCE]." (*Id.* ¶¶ 78f, 78h.) Mr. Davis explained that TCA, like other halogenated hydrocarbons, volatizes and becomes a part of the breathing atmosphere so that "as soon as they [are] used, they contaminate the air that . . . people breathe." (*Id.* ¶¶ 77p, 77q.) He acknowledged that halogenated hydrocarbons, hydrocarbon distillates, and petroleum distillates all volatize, were subject to fugitive emissions, and can attack the brain. (*Id.* ¶¶ 77o, 77q, 77s.)

In an effort to prove that TCE, via #4 Solvent, was used in Inspection and Corlon where he had worked, Claimant presented the testimony of his co-worker

7

John Yost. Mr. Yost testified that "Chloroethene" and something referred to as a "safety solvent" was used in the areas where he and Claimant worked. (Hr'g Tr., May 29, 2008, at 26.) This resulted in some confusion over what substance was used in Inspections and Corlon due to the similarity in the chemical names of the relevant substances and because "Chloroethene" is a vinyl chloride monomer (VCM) and a gas, not a solvent. After additional testimony regarding the differences between "Chloroethene," "Chlorothene," (which is TCA), and "Trichloroethylene," (which is TCE), the WCJ directed that Mr. Yost's transcript be corrected to reflect that "Chlorothene" (TCA) was the solvent used. (FOF ¶ 11.) However, there were other instances in the record where the similarity of the chemical names of TCA and TCE resulted in confusion regarding to which substance the witnesses were referring.

Both parties presented a number of expert witnesses in various medical and scientific fields. Claimant's experts included: Reuban Gur, Ph.D., a neuropsychologist; Ranhnish Chaudhry, M.D., a neurologist; Frederick W. Fochtman, Ph.D., a board-certified toxicologist; and Timothy Martin, M.D., a neurologist. The WCJ found the testimony of these witnesses to be credible, convincing, and worthy of belief.

Dr. Gur described the effects that exposure to halogenated hydrocarbons can have on the brain's structure and the corresponding changes to a person's behavior. (*Id.* ¶ 80.) According to Dr. Gur, Claimant's PET scan revealed abnormal brain function, and a February 2008 MRI revealed extensive damage mostly to Claimant's frontal lobe but extending into other areas, including the corpus callosum, which is the connector between the left and right brain and which, in Claimant, was more than two standard deviations lower than normal. (*Id.* ¶¶ 80o-

8

q.)  The "[r]eduction of [corpus] callosum volume indicates solvents because solvents work by melting fat" and the corpus callosum is a "body of nerve fibers surrounded by myelin (fat)." (*Id.* ¶ 80r.)  He explained that the effects of solvent exposure on the structures of the mid-brain, such as the corpus callosum, can result in Parkinsonian symptoms. (*Id.* ¶ 80w.)  Based on his examination of Claimant, Claimant's MRIs, PET scan, the ruling out of other diagnoses for Claimant's condition by Claimant's treating physicians, and the history of Claimant's exposure to solvents over time, Dr. Gur opined that Claimant had toxic encephalopathy due to toxin exposure, and that this exposure also caused Claimant's Parkinsonian symptoms and dementia. (*Id.* ¶¶ 80w-y.)  He explained that while the brain may stabilize when exposure is stopped, there are certain processes that are hard to reverse and can result in the continued deterioration of the brain. (*Id.* ¶ 80ff.)  Dr. Gur also indicated that Claimant's deterioration was faster than a typical Alzheimer's patient. (*Id.* ¶ 80aa.)

Dr. Chaudhry testified that he saw Claimant in July 2010, August 2010, and November 2010, and that, in July, Claimant was unable to complete a neurologic exam because Claimant would not or could not speak to him and/or follow commands and could not stand or walk. (*Id.* ¶¶ 82b-c.)  By August, Claimant was starting to show Parkinsonian symptoms, and by November, Claimant's behavior was much worse. (*Id.* ¶¶ 82d-f.)  Based on Wife's description of Claimant's exposure history and the reports of Claimant's industrial hygienist,[11] which

---

[11] Claimant's industrial hygienist, Donna Wilson, testified that she "identified several organic problems, halogenated solvents, and petroleum based solvents," in the area Claimant worked and, according to the TRI, there were halogenated hydrocarbons and hydrocarbon distillates present at Employer's plant. (FOF ¶¶ 74e, 74g.)  The WCJ did not find this testimony either credible or incredible because it was not germane because "as litigation developed the **(Footnote continued on next page…)**

9

reflected a history of toxic exposure at work to TCE, TCA, organic solvents, and other toxins, and the fact that the differential diagnoses, such as trauma, stroke, and tumors, were ruled out, Dr. Chaudhry opined that Claimant had organic brain syndrome (encephalopathy or dementia) from that exposure. (*Id.* ¶¶ 82g-h.)

Dr. Fochtman explained he was familiar with the hydrocarbon distillates to which Claimant was exposed and explained how those, as well as halogenated hydrocarbons, can enter the brain and cause toxic encephalopathy by attacking the cells in the brain. (*Id.* ¶¶ 84c-d.) He explained that exposure to even small amounts of these substances over time can build up and a single incident can push the buildup "over the edge" and cause damage that, if severe enough, is irreversible. (*Id.* ¶¶ 84e, k.) He opined that Claimant's exposure to halogenated hydrocarbons and hydrocarbon distillates caused Claimant's toxic encephalopathy. (*Id.* ¶ 84h.) As for Claimant's Parkinsonian symptoms, Dr. Fochtman explained that TCE exposure can cause those symptoms because of the way TCE metabolizes. (*Id.* ¶¶ 84f, 84i.) Dr. Fochtman indicated that TCA and TCE are different and, while their solvent effect on the body is similar, TCE is a more harmful solvent. (*Id.* ¶ 84m.)

Dr. Martin, a board-certified neurologist and psychiatrist, testified that he was aware that Claimant had some exposure of solvents at work and later learned more about that exposure. (*Id.* ¶¶ 86a-b, 86e.) Dr. Martin ruled out a variety of differential diagnoses and opined that Claimant suffered from progressive dementia secondary to solvent exposure. (*Id.* ¶¶ 86g-h.) He agreed with Dr. Gur's

---

**(continued…)**
Employer admitted the existence of these chemicals [(halogenated hydrocarbons and others)]" at the Lancaster plant. (*Id.* ¶ 76.)

findings and explained that demyelinating illnesses, such as Multiple Sclerosis, have a very focal neurological process, but Claimant's brain showed a global change, with changes in his frontal, temporal, and parietal areas, and these changes are progressive. (*Id.* ¶¶ 86i-j.) Dr. Martin further explained that Parkinsonian symptoms can be seen with toxic encephalopathy because, with a general deterioration of the brain, movement disorders and cognitive impairment can develop. (*Id.* ¶ 86j.) Dr. Martin did not believe Claimant had Alzheimer's disease and could not find another "explanation for Claimant's decline other than exposure to some type of hydrocarbon, probably TCE if the history is exposure to that." (*Id.* ¶¶ 86k-*l*.) However, if there was no history of exposure to solvents, Dr. Martin would diagnose Claimant with dementia of unknown etiology. (*Id.* ¶ 86p.) After receiving additional information about Claimant's potential exposure to TCE, Dr. Martin later testified more specifically as to how TCE effects the "basal ganglia and substantia nigra structures, which is [from] where Parkinsonian symptoms would have come." (*Id.* ¶ 87c.)

In opposition to the Claim Petition, Employer presented the testimony of Gordon Sze, M.D., a neuroradiologist; and Michael Holland, M.D., who is board-certified in emergency medicine, medical toxicology, occupational medicine, and undersea and hyperbaric medicine. Unlike Claimant's witnesses, neither of Employer's witnesses examined or provided treatment to Claimant. (*Id.* ¶¶ 90d, 92b.) Employer's witnesses disagreed that Claimant was suffering from toxic encephalopathy with dementia and Parkinsonian symptoms as a result of solvent exposure. (*Id.* ¶¶ 90e, 90i-j, 90n, 92.) Those experts opined that Claimant's medical records, MRIs, and PET scan did not support this diagnosis. (*Id.* ¶¶ 90f, 92c, 92h-i.) Dr. Sze testified, however, that he did not "want to deal with any

11

occupational exposure issues" because "[i]t's not [his] area of expertise." (*Id.* ¶ 90s.) Dr. Holland opined that Claimant had early onset Alzheimer's disease. (*Id.* ¶ 92f.) The WCJ found Dr. Sze's opinions to be credible, but rejected them where they differed from those of Claimant's experts. (*Id.* ¶ 91.) The WCJ rejected Dr. Holland's testimony as not credible or convincing and, where his opinions differed from Claimant's experts, they were rejected. (*Id.* ¶ 93.)

Based on the credited evidence and testimony, the WCJ found that over Claimant's 30-year tenure working for Employer, he was "exposed to various chemicals, solvents and chemical compounds, such as specifically, but limited to . . . Chlorothene, Trichloroethane, Trichloroethylene, #4 Solvent, Top Foam, OB/Blue, Intercide ABF and Aromatic 150 (Solvesso) . . . ." (*Id.* ¶ 99.) The WCJ further found that "Claimant . . . [was] exposed to various halogenated hydrocarbons, hydrocarbon distillates, and petroleum distillates during his 30[-]year tenure . . . with [Employer]." (*Id.* ¶ 100.) Due to this exposure, the WCJ found, Claimant sustained "toxic encephalopathy resulting in Parkinsonian symptoms as diagnosed by Dr. Reuben Gur." (*Id.* ¶ 103.) Additionally, the WCJ found that the Claim Petition was filed within the time required by the WC Act because "Claimant became aware of the possibility of his medical condition being related to an exposure of chemicals in the workplace in November 2007." (*Id.* ¶ 102.) For these reasons, the WCJ granted the Claim Petition, as of April 23, 2004, and directed Employer to pay for Claimant's reasonable and necessary medical expenses and litigation costs in the amount of $99,684.04.[12] (*Id.* ¶¶ 105-06, 108.)

---

[12] The WCJ dismissed a separately-filed claim under The Pennsylvania Occupational Disease Act, Act of June 21, 1939, P.L. 566, *as amended*, 77 P.S. §§ 1201-1603. (WCJ Order, June 28, 2012.)

The WCJ found Employer's contest was reasonable and, therefore, did not award unreasonable contest attorney's fees. (*Id.* ¶ 109.)

## II. Board Decision

Employer appealed to the Board, arguing, as relevant here, that the WCJ erred in finding the Claim Petition was timely filed and that Claimant met his burden of proving a causal connection between his condition and his exposure to chemicals at work. On the first issue, Employer argued the "discovery rule" did not apply to toll the statute of limitations, set forth in Section 315 of the WC Act, 77 P.S. § 602, because this was not an occupational disease case. The Board rejected this argument, stating "that a fair reading of the WCJ's Decision indicate[d] that she granted Claimant's claim and awarded benefits under the occupational disease provisions of the [WC] Act, and as such, the 'discovery rule' would apply for purposes of the statute of limitation." (Board Op., Nov. 26, 2014, (2014 Board Op.) at 4 n.5.) Because Claimant's guardian, Wife, first received notice that Claimant's condition was work related in November 2007, when a physician's statement sent to Employer's long-term disability carrier indicated as much, the Board held that the claim was timely filed. (*Id.* at 4 (citing *Temple Univ. v. Workmen's Comp. Appeal Bd. (Ins. Co. of N. Am.)*, 588 A.2d 63, 66 (Pa. Cmwlth. 1991)).)

On the second issue, whether Claimant met his burden of proof on causation, the Board went through the testimony and evidence presented and concluded that

> [b]oth parties presented multiple witnesses who testified as to the presence of chemicals in [Employer's] plant. While there was some dispute as to the extent Claimant may have been exposed to these chemicals . . . , the WCJ resolved this issue in Claimant's favor based on the credible testimony of various witnesses that Claimant was

13

exposed to various chemicals and solvents during the course of his extensive career with [Employer] . . . . In addition, the WCJ accepted as credible Claimant's medical experts, who all testified as the effects that the chemicals and solvents to which Claimant was exposed, had on his brain, which resulted in toxic encephalopathy, which led to Claimant's mental decline.

(*Id.* at 21-22.) This credible evidence, the Board concluded, constituted substantial evidence to support the WCJ's findings. Accordingly, there was no error in the WCJ granting the Claim Petition based on those findings.

For these reasons, the Board affirmed these two determinations of the WCJ. However, the Board remanded the matter for further proceedings on two matters.[13] Following these proceedings, the Board issued its July 24, 2017 Order, in which it certified its November 26, 2014 order as final, making it appealable. Employer now petitions this Court for review.[14]

### III. Discussion

#### A. *Whether the Claim Petition was Timely.*

Employer first argues that, pursuant to Section 315 of the WC Act, a claim petition must be filed within three years after the date of injury. It acknowledges that the "discovery rule" may toll this three-year period for an occupational disease claim, *City of McKeesport v. Workers' Compensation Appeal Board (Miletti)*, 746 A.2d 87, 90 n.7 (Pa. 2000); however, that rule does not apply in a work **injury**

---

[13] Employer also raised several other issues with which the Board agreed and either modified the decision or remanded for further proceedings. (2014 Board Op. at 22-24.)

[14] In reviewing Board orders, we determine "whether constitutional rights were violated, whether the adjudication is in accordance with the law[,] or whether necessary findings of fact are supported by substantial evidence." *City of Phila. v. Workers' Comp. Appeal Bd. (Sherlock)*, 934 A.2d 156, 159 n.5 (Pa. Cmwlth. 2007).

14

case, *Armco, Inc. v. Workmen's Compensation Appeal Board (Mattern)*, 667 A.2d 710, 717 (Pa. 1995). Employer asserts the WCJ did not treat Claimant's claim as an occupational disease claim, which was appropriate because toxic encephalopathy is not mentioned as a specific occupational disease under Section 108 of the WC Act, 77 P.S. § 27.1. Accordingly, Employer argues, this claim is time barred.

Claimant responds that the WCJ found that the claim was timely because he did not know that his injury, which was an "occupational disease" under the WC Act because it was caused by "poisoning by . . . halogenated hydrocarbons . . . or any preparations containing these chemicals," was work related until he was diagnosed with work-related toxic encephalopathy in November 2007. (Claimant's Brief (Br.) at 14 (quoting 77 P.S. § 27.1(c)).) Because his total disability was due to an occupational disease under those provisions of the WC Act, Claimant argues the discovery rule applies and the Claim Petition had to be filed within three years of when he knew or should have known through reasonable diligence that the disability was caused by an occupational disease. *Jones & Laughlin Steel Corp. v. Workmen's Comp. Appeal Bd. (Feiertag)*, 496 A.2d 412, 419 (Pa. Cmwlth. 1985). Here, his Claim Petition was filed approximately one month after the discovery that Claimant's condition was work related and, accordingly, it was timely. *Temple Univ.*, 588 A.2d at 66.

Section 315 of the WC Act addresses when claims for WC benefits must be filed and provides, in relevant part:

15

> In cases of personal injury[15] all claims for compensation shall be forever barred, unless, within three years after the injury, . . . one of the parties shall have filed a petition as provided in article four hereof . . . . The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.

77 P.S. § 602. Under this section generally, a claimant seeking workers' compensation benefits for an alleged work-related injury must file a claim within three years of that injury or that claim will be time barred. *Armco, Inc.*, 667 A.2d at 717. However, where the "injury" is a claim for total disability caused by an occupational disease, the three-year statute of limitations begins to run from "when the claimant knows or should know that he or she suffers from total disability due to occupational disease." *Price v. Workmen's Comp. Appeal Bd. (Metallurgical Res.)*, 626 A.2d 114, 115 (Pa. 1993) (emphasis omitted). "This knowledge will most often occur [when] . . . a medical diagnosis of the total disability due to occupational disease is made known to the claimant." *Id.* The occupational disease provisions of the WC Act are set forth in Section 108, which states, in relevant part:

> The term "occupational disease," as used in this act, shall mean only the following diseases.
> . . . .
> (c) **Poisoning by** . . . **hydrocarbon distillates** (naphthas and others) or **halogenated hydrocarbons**, . . . or any preparations containing these chemicals or any of them, in any occupation involving direct contact with, handling thereof, or exposure thereto.
> . . . .

---

[15] The WC Act defines "personal injury" to include: (1) "an injury to an employe, regardless of his previous physical condition, except as provided under subsection (f), arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury"; and (2) "occupational disease as defined in section 108 of this act." Section 301(c) of the WC Act, 77 P.S. § 411.

16

(n) All other diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population . . . .

77 P.S. § 27.1(c), (n) (emphasis added). Subsection (c) refers to a particular type of disease, poisoning by, among other things, hydrocarbon distillates or halogenated hydrocarbons, and subsection (n) is referred to as the "catch-all" provision. *Pawlosky v. Workmen's Comp. Appeal Bd. (Latrobe Brewing Co.)*, 473 A.2d 260, 261 n.4 (Pa. Cmwlth. 1984), *aff'd*, 525 A.2d 1204 (Pa. 1987).

Here, Claimant filed petitions that specifically included claims under Section 108(c) and (n) of the WC Act. Employer argues this matter cannot be considered an occupational disease claim because toxic encephalopathy is not a disease specifically listed in Section 108(c), which refers only to "[p]oisoning." (Employer's Br. at 33 and n.7.) However, our Supreme Court affirmed the application of the discovery rule to a claim under Section 108(a) of the WC Act for "lead encephalopathy" caused by work-related exposure to lead notwithstanding that this section refers to "poisoning by . . . lead" but not specifically to "encephalopathy." *Price*, 626 A.2d at 117. Moreover, the claimant in *Temple University* successfully asserted a claim pursuant to Section 108(c) for organic brain damage and an immune dysfunction, neither of which is specifically referenced by this section, due to her overexposure to halogenated hydrocarbons. 588 A.2d at 64-65. Like the "lead encephalopathy" and "organic brain damage" at issue in *Price* and *Temple University*, "toxic encephalopathy" is a type of "poisoning" caused by exposure to halogenated hydrocarbons and hydrocarbon distillates under Section 108(c) of the WC Act, and reading Section 108 as narrowly as Employer asserts is inconsistent with our precedent.

17

Although the WCJ did not specifically find that Claimant suffered from an occupational disease, she did find that Claimant's toxic encephalopathy was caused by his work exposure to, among other chemicals, halogenated hydrocarbons and hydrocarbon distillates. "Poisoning" by these chemicals is expressly addressed as an occupational disease in Section 108(c) of the WC Act. As the Board held, a "fair reading" of the WCJ's decision was that Claimant's claim was based on the occupational disease provisions of the WC Act. (Board 2014 Op. at 4 n.5.) Because Claimant sought compensation for total disability due to an occupational disease, he had three years from when he knew or should have known that his total disability was work-related. *Price*, 626 A.2d at 115. The WCJ found that this occurred in November 2007, when Wife learned, from a document signed by Claimant's then-treating physician, that Claimant was suffering from work-related toxic encephalopathy. The December 2007 Claim Petition was filed within three years of November 2007 and, therefore, was timely.

> B.     *Whether Claimant Met His Burden of Proof on the Claim Petition.*

Employer next argues the Board erred in affirming the grant of the Claim Petition because there was no competent medical evidence to support the conclusion that Claimant's condition was caused by his exposure to **TCE** in the workplace. Employer further asserts there is no evidence to support the findings that Claimant experienced significant exposure to TCE, via #4 Solvent, because that solvent was not used where Claimant worked and no TCE was present in the September 25, 2003 spill. To the extent Claimant continues to argue that he was exposed to TCE, Employer asserts Claimant relies only upon the uncorrected transcript of Mr. Yost's testimony which Claimant contends indicated that TCE was used in Inspections and Corlon. Absent evidence of significant exposure to

18

TCE, which does not exist, Employer argues, Claimant's experts' testimony is not competent because they all relied upon Claimant's exposure to TCE to diagnose him with toxic encephalopathy with Parkinsonian symptoms. *City of Phila. v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 764 (Pa. 2011) (stating that an expert's testimony that is based on an inaccurate history cannot be substantial evidence to support an award of benefits). In particular, Employer cites Dr. Martin's testimony on cross-examination that he would have no other explanation for Claimant's condition, and the Parkinsonian symptoms in particular, if Claimant had not been exposed to TCE at work and that, absent that exposure, the diagnosis would be dementia of an unknown etiology. (Reproduced Record (R.R.) at 190a-91a.) Finally, Employer points out that the WCJ repeatedly confused **TCA and TCE** and that, while Claimant may have established exposure to **TCA** and Solvesso, those materials would not have caused Claimant's Parkinsonian symptoms.

Claimant asserts there is substantial evidence to support that he was exposed to TCE while working at Employer's Lancaster plant. He asserts that, in response to Claimant's discovery request for his Exposure and Medical Records, Employer produced the MSDS for, among other materials, #4 Solvent, which is a blend of two hydrocarbon solvents, TCE and methyl ethyl ketone. According to Claimant, Employer took the position that it was producing only items that it thought were "relevant" to Claimant's employment, and giving him the MSDS for #4 Solvent indicates that it was relevant. Claimant also asserts that his witness, Mr. Yost, testified that Chloroethene was used throughout the plant as a cleaning agent. Thus, Claimant argues, the WCJ had evidence in the record to support her

conclusion that Claimant was exposed to "Trichloroethene,[16] Trichloroethylene [and] #4 Solvent," and the causation opinions of his experts were supported by the evidence. (Claimant's Br. at 22.)

In a claim petition proceeding, the claimant bears the burden of establishing all of the elements necessary to support an award of WC benefits, including the existence of an injury and disability, and a causal relationship between the injury and the claimant's work. *Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Thomas)*, 725 A.2d 873, 876 (Pa. Cmwlth. 1999). Pursuant to Section 108(c) of the WC Act, an occupational disease includes "[p]oisoning by . . . hydrocarbon distillates . . . or halogenated hydrocarbons, . . . or any preparations containing these chemicals . . ., in any occupation involving direct contact with, handling thereof, or exposure thereto." 77 P.S. § 27.1(c).

Employer contends Claimant did not meet his burden of proof on the Claim Petition, and challenges the WCJ's factual determination that Claimant was exposed to, among other halogenated hydrocarbons, TCE, as well as the competency of Claimant's expert witnesses. Where a party challenges a WCJ's findings on the basis that they are not supported by substantial evidence, we are guided by the following well-settled legal principles. The WCJ, as the ultimate fact-finder, "has exclusive province over questions of credibility and evidentiary weight[,]" and we are bound by those determinations. *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013) (quoting *Anderson v. Workers' Comp. Appeal Bd. (Penn Ctr. for Rehab.)*, 15 A.3d 944, 949 (Pa. Cmwlth. 2010)). "The WCJ may accept or reject the testimony of

---

[16] The WCJ actually found that Claimant was exposed to "Trichloroethane," not "Trichloroethene" as Claimant indicates in his brief.

20

any witness, including a medical witness, in whole or in part." *Id.* In a substantial evidence challenge, we "view the evidence in the light most favorable to the prevailing party and give [that party] the benefit of all inferences reasonably deduced from the evidence." *Id.* "Substantial evidence is such relevant evidence a reasonable mind might accept as adequate to support a conclusion." *WAWA v. Workers' Comp. Appeal Bd. (Seltzer)*, 951 A.2d 405, 407 n.4 (Pa. Cmwlth. 2008). "[I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005). If there is "such evidence, the findings must be upheld." *A & J Builders, Inc.*, 78 A.3d at 1238-39.

The WCJ found that Claimant was exposed to numerous chemicals, including multiple halogenated hydrocarbons, such as TCE and TCA, and hydrocarbon distillates, such as Solvesso. The WCJ concluded that it was Claimant's exposure to these materials, not just TCE, that caused his toxic encephalopathy with Parkinsonian symptoms. The record supports the finding that Claimant was exposed to TCA, via the solvent Chlorothene, while working in Inspections and Corlon, as well as Solvesso, while assisting in cleaning up the September 2003 spill and working in Rotogravure beginning in 2004. Employer's Global EHS Manager, Mr. Davis, testified that, like TCE, TCA and Solvesso volatize and become part of the atmosphere, contaminate the breathing air, and can attack the brain. (Hr'g Tr., Sept. 29, 2009, at 114; FOF ¶¶ 78g-h.)

Employer appears only to challenge the finding that Claimant was exposed to TCE. We agree with Employer that Claimant's reliance on Mr. Yost's testimony to support his contention that he was exposed to TCE is misplaced. The

original transcript reflected that Mr. Yost testified that he and Claimant used Chloroethene/VCM to clean parts and rollers, but Chloroethene/VCM is a gas, not a solvent. Upon reviewing other evidence, the WCJ found that the transcript of Mr. Yost's testimony should have reflected that Chlorothene was used to clean. (FOF ¶ 11.) Nevertheless, we agree with the Board that both Claimant and Employer presented evidence regarding Claimant's exposure to chemicals, including TCE, at work. And, while there were disputes regarding the extent to which Claimant may have been exposed, the WCJ carefully reviewed the evidence and, acting within her role as fact finder and arbiter of credibility and evidentiary weight, credited the evidence of exposure, rather than non-exposure.[17] Our review of the record reveals evidence that, when viewed in the light most favorable to Claimant as the prevailing party, supports the WCJ's findings and conclusion that Claimant satisfied his burden of proof.

For example, there was testimony that TCE was used throughout Employer's Lancaster plant, including by maintenance workers, who had it in spray cans and buckets. (Hr'g Tr., Sept. 29, 2009, at 115-16; Hr'g Tr., Nov. 4, 2011, at 228; FOF ¶ 78f.) Additional testimony indicated that, at some point, "Chlorothene," the name of the solvent utilized in Corlon, was also used by Dow Chemical as the trade name for "trichloroethylene," which is TCE. (Hr'g Tr., Nov. 4, 2011, at 304; FOF ¶ 78h.) According to other testimony, "trichloroethylene" was used at the Ten Table "early on" and in the maintenance shop in the Big Room, places where Claimant worked between 1983 and 2004. (Hr'g Tr., July 30, 2009, at 165-66,

---

[17] To the extent Employer asserts the WCJ was confused by the differences between TCE and TCA, the WCJ presided over this matter for almost a decade and was aware of the various terms and their meanings. While there may have been the occasional misstatement of a scientific term in the WCJ's opinion, such errors do not establish that the WCJ was confused.

22

169; *see* FOF ¶¶ 14m, 53*l*, 98.) The MSDS for #4 Solvent, which contains TCE, was given to Claimant during discovery as evidence described by Employer as relevant to his claim. (FOF ¶ 58; Ex. C-24.) The evidence further reveals that Employer's plant used and disposed of, at some points, hundreds of thousands of pounds of TCE, 900,000 pounds of which were released into the air in one year. (FOF ¶ 49; Ex. C-22; Hr'g Tr., Nov. 4, 2011, at 297-98.) Viewing this credited evidence, and the reasonable inferences deducible therefrom, in the light most favorable to Claimant, a reasonable mind might accept it as evidence that Claimant was exposed to TCE, along with other halogenated hydrocarbons and hydrocarbon distillates, during his 30 years working for Employer. Accordingly, the WCJ's findings in this regard are supported by the record.

Employer also challenges the competency of Claimant's expert witnesses, arguing that they all erroneously relied on evidence of Claimant's exposure to TCE in rendering their opinions regarding the work-relatedness of Claimant's diagnoses. "Medical evidence that relies on possibilities, or is less than positive" is equivocal and not legally competent evidence on causation. *Kriebel*, 29 A.3d at 769 (quotation omitted). An expert may base an opinion on facts of which the expert does not have personal knowledge, but "those facts must be supported by record evidence." *Id.* at 771. Whether an expert's opinion is competent is a question of law subject to plenary review. *Lewis v. Workmen's Comp. Appeal Bd. (Pittsburgh Bd. of Educ.)*, 498 A.2d 800, 803 (Pa. 1985). "In conducting such review the medical witness's entire testimony must be reviewed and **taken as a whole**[,] and a final decision 'should not rest upon a few words taken out of the context of the entire testimony.'" *Id.* (quoting *Wilkes–Barre City v. Workmen's*

*Comp. Appeal Bd. (Scott)*, 420 A.2d 795, 798 (Pa. Cmwlth. 1980)) (emphasis added).

On the issue of causation, the WCJ found that Claimant was exposed to a number of halogenated hydrocarbons and hydrocarbon distillates, and that his work injury was, as diagnosed by Dr. Gur, "toxic encephalopathy resulting in Parkinsonian symptoms." (FOF ¶¶ 100, 103.) Employer narrowly reads Claimant's experts' testimony as being that Claimant's exposure to TCE alone caused his toxic encephalopathy with Parkinsonian symptoms. However, as concluded above, the WCJ's finding that Claimant was exposed to TCE over his 30 years working for Employer is supported by the record. Therefore, to the extent Claimant's experts relied upon TCE exposure to reach their conclusions, that reliance did not render their testimony not legally competent.[18]

Moreover, although the parties focus on Claimant's exposure to TCE, the WCJ found that Claimant's toxic encephalopathy with Parkinsonian symptoms was the result of Claimant's work-related exposure to numerous chemicals and solvents, only one of which was TCE. (FOF ¶¶ 80w-y, 82g-h, 86k, 100, 103.) Carefully reviewing the credited expert testimony as a whole, as we must, *Lewis*, 498 A.2d at 803, that expert testimony also supports the WCJ's more general finding that exposure to halogenated hydrocarbons and/or hydrocarbon distillates caused Claimant's condition. Dr. Gur explained how halogenated hydrocarbon and hydrocarbon distillate solvents attacked Claimant's brain and caused his encephalopathy. (Hr'g Tr., Nov. 10, 2010, at 32-50, 61-62, 85.) He indicated that

---

[18] Employer also contends that Claimant's experts' opinions were based on their understanding that Claimant was exposed to a significant amount of TCE. However, several of Claimant's experts testified that exposure to small amounts of halogenated hydrocarbons over long periods of time can cause brain damage like the damage Claimant sustained.

even small doses over a long period of time can result in toxic encephalopathy, which can produce symptoms that cross disease barriers, such as seizures and Parkinsonian symptoms. (*Id.* at 63, 69-71.) Although TCE was one of the materials Dr. Gur was told Claimant was exposed to at work, it was not the only halogenated hydrocarbon on that list. Dr. Fochtman explained that Claimant's exposure to hydrocarbon distillates, such as Solvesso, could cause toxic encephalopathy. (Hr'g Tr., Jan. 5, 2011, at 12.) He further opined that hydrocarbons, generally, have a solvating effect on the brain and can cause toxic encephalopathy. (*Id.* at 16-17, 37.) Dr. Fochtman explained that if there was **no** exposure to solvents, then his diagnosis would be dementia of unknown etiology. (*Id.* at 54.) Dr. Martin agreed with Dr. Gur's testimony, and he indicated that chronic exposure to lower levels of solvents over time could cause toxic encephalopathy. (*Id.* at 72-73, 84.) He further explained that Parkinsonian symptoms can occur when there is a general deterioration of the brain. (*Id.* at 91-92.) The testimony of Dr. Martin cited by Employer in its brief occurred during cross-examination and focused on TCE as the cause of Claimant's Parkinsonian symptoms. (Hr'g Tr., Oct. 6, 2011, at 37-38.) However, Dr. Martin also testified that exposure to halogenated hydrocarbons generally can cause toxic encephalopathy, that general brain deterioration can result in Parkinsonian symptoms, and that Claimant's condition was caused by his exposure to halogenated hydrocarbons at work. The WCJ credited these experts' testimony and, viewing this evidence and the reasonable inferences deducible therefrom in the light most favorable to Claimant, a reasonable mind might accept it as evidence that supports the WCJ's findings and conclusion that Claimant met his burden of proof on the Claim Petition.

## IV.     Conclusion

Because the Board did not err in concluding that the Claim Petition was timely filed and that the WCJ's findings and conclusions that Claimant met his burden of proof on the Claim Petition were supported by substantial, competent evidence, we affirm.[19]

 _____
 **RENÉE COHN JUBELIRER,** Judge

Judges McCullough and Ceisler did not participate in the decision in this case.

---

[19] For these reasons, we dismiss what Claimant has filed and called an Application for a Writ of Mandamus, which seeks the same relief as Claimant's other filings, a remand for further proceedings on the Claim Petition.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong World Industries, Inc.,    :
                     Petitioner    :
                                 :
              v.                :   No. 1089 C.D. 2017
                                 :
Workers' Compensation Appeal    :
Board (Cooper, deceased),        :
                  Respondent    :

## O R D E R

**NOW**, November 16, 2018, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**. In addition, the Application to Strike the Pleadings filed by Barley Snyder, LLP, filed by counsel for Gene M. Cooper (deceased) (Claimant), is **DENIED**, and the Application for a Writ of Mandamus filed by Claimant is **DISMISSED**.

 

 

                                    _____

                                    **RENÉE COHN JUBELIRER,** Judge